* * * * * * * * * * *
Upon review of the competent evidence of record, with reference to the errors assigned, and finding no good grounds to receive further evidence, or to rehear the parties or their representatives, the Full Commission, upon reconsideration of the evidence, affirms with some modifications, the Opinion and Award of the Deputy Commissioner.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission, and the Industrial Commission has jurisdiction of the parties and of the subject matter. *Page 2 
2. All parties are subject to and bound by the North Carolina Workers' Compensation Act.
3. All parties have been properly designated and there is no question as to misjoinder or nonjoinder of parties.
4. The carrier on the risk for this claim is Builders Mutual Insurance Company.
5. An employment relationship existed between Plaintiff and Defendant-Employer on October 21, 2005.
6. Plaintiff's average weekly wage is $387.03, yielding a compensation rate of $258.04.
7. Plaintiff alleges that he sustained an accidental injury to his lungs on or about October 21, 2005, following a two day exposure to a large volume of cinder block dust resulting in pulmonary inflammation and total disability.
8. Defendants contend that Plaintiff's alleged dust exposure did not result in any compensable consequences.
9. The masonry wall that Plaintiff cut was made of block that was primarily made up of Portland cement, sand, and cinders, which contained silica as the primary ingredient.
10. The parties stipulated into evidence as Stipulated Exhibit 1 the parties' Pre-Trial Agreement.
11. The parties stipulated into evidence as Stipulated Exhibit 2(a) Industrial Commission forms.
12. The parties stipulated into evidence as Stipulated Exhibit 2(b) Plaintiff's medical records. *Page 3 
13. The parties stipulated into evidence as Stipulated Exhibit 2(c) photographs, numbered 2C1 through 2C8.
14. Defendants submitted into evidence Plaintiff's personnel records and wage records.
 * * * * * * * * * * *
The following issues are in contention:
 ISSUES
1. Whether Plaintiff sustained an injury by accident on or about October 21, 2005 following a two day exposure to cinder block dust resulting in injury to his lungs?
2. If so, what are the compensable consequences of this injury?
 * * * * * * * * * * *
Based upon the competent and credible evidence of record in this matter, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff is a 50-year-old male, with a date of birth of December 30, 1957. He has an eighth grade education, and has been employed in heavy labor his entire life. He last worked in construction as a carpenter for Defendant-Employer. As of the hearing date, he worked for Defendant-Employer for about three and one-half years.
2. Plaintiff is a long-term smoker, having smoked a pack or more of cigarettes a day for approximately 30 years. Plaintiff's medical history includes hypertension, anxiety, allergic rhinitis, headaches, weakness and fatigue, rib pain, and conditions caused by his cigarette smoking, including difficulty breathing, pharyngitis, hoarseness, emphysema, and diffuse chronic obstructive pulmonary disease (COPD). *Page 4 
3. On October 21, 2005, Plaintiff was tearing down a cinder block wall, using a sledgehammer and saw. He was using the masonry saw to cut nine by nine by nine foot holes in a cinder block wall that was 12 inches thick. For two days, Plaintiff was sawing and sledgehammering the wall. This sawing created a large amount of dust from the breakdown of the cinder blocks. Plaintiff inhaled this dust. The cinder block consisted of Portland cement, sand, and cinders, which contained silica. Plaintiff normally worked with wood, and had not been involved in tearing out cinder block before. As such, this was not typical of his work routine.
4. At or near the time that Plaintiff began sawing the wall, he complained about the need for a mask because of the heavy dust. A representative of Defendant-Employer searched for a mask and found on the premises a paper mask similar to those used by painters. Plaintiff used this mask, even though he testified, and the Full Commission finds as fact, that the mask was ineffective as it was not designed for this type of task.
5. Plaintiff's sawing of the cinder block wall created such a large amount of dust that he could not see to the end of the plant, and the workers could not see one another. He could not see his clothes under the dust or the color of his skin. Plaintiff inhaled this dust over the two day period that he was sawing and sledgehammering the wall. This dusty environment was of such a magnitude as to constitute an unusual condition likely to result in unexpected consequences.
6. After sawing the cinder block for this two day period, Plaintiff began having trouble breathing, and had pain in his chest. These acute symptoms frightened Plaintiff, so he reported his breathing difficulty and chest pain to his supervisor, Al Gibson, and went home.
7. Plaintiff's symptoms persisted over the weekend, so he presented to Dr. Shank, his primary care physician, on October 24, 2005. He was seen by the physician's assistant, and *Page 5 
reported complaints of shortness of breath. Dr. Shank was concerned about possible heart problems, and after consulting a cardiologist, referred Plaintiff to the emergency room.
8. Plaintiff was seen at Stanly Memorial Hospital Emergency Room later that date, October 24, 2005, with chest pain, dizziness, and headache. He had an EKG on October 24th and October 25th, which came back normal. He also had an MRI of the brain, neck, and head on October 25th, which also came back normal. A portable chest x-ray taken on October 24th showed that he had hyperinflated lungs, with evidence of underlying obstructive lung disease.
9. On November 14, 2005, Plaintiff treated with Dr. Patrick Anonick of Heart Group of the Carolinas in Albemarle for complaints of chest pain. Plaintiff underwent an exercise stress echocardiogram, which revealed negative findings. Dr. Anonick indicated that from a cardiovascular standpoint, Plaintiff was able to return to work as of November 14, 2005.
10. After ruling out a cardiac component to Plaintiff's condition, Dr. Shank sent Plaintiff for a pulmonary function test on November 14, 2005. The test showed moderate obstructive ventilatory defect with a mild reduction in diffusion capacity.
11. Plaintiff returned to see Dr. Shank on November 16, 2005. At this visit, he first told Dr. Shank that his shortness of breath began when he was around a lot of dust and paint fumes. Dr. Shank reviewed the results of the testing with Plaintiff. On this visit, Plaintiff was still complaining of shortness of breath, especially when he was around a lot of dust and paint fumes, and he told Dr. Shank that he felt lightheaded any time he stood up or tried to do anything, or if he got up on steps or any elevation.
12. At this visit, Dr. Shank changed his focus to pulmonary problems. Dr. Shank diagnosed Plaintiff with exacerbation of his underlying emphysema and COPD, and possibly pneumonitis. Dr. Shank attributed Plaintiff's underlying COPD to his smoking. Dr. Shank *Page 6 
recommended that Plaintiff stay away from dust and fumes, avoid going up on ladders due to lightheadedness, and quit smoking. Dr. Shank began treating Plaintiff with a course of steroids.
13. Dr. Shank has been Plaintiff's treating physician since May 2003, and he last saw Plaintiff on June 21, 2006. In describing Plaintiff's complaints prior to October 24, 2005, Dr. Shank testified that Plaintiff complained of hoarseness previously, and his physician's assistant diagnosed him with possible sleep apnea. Dr. Shank also testified that he knew Plaintiff smoked one to two packs of cigarettes per day for many years. Even so, Dr. Shank testified that the October 24, 2005 visit was the first time that Plaintiff came in with acute shortness of breath and chest pain.
14. Plaintiff returned to work by the time he came back to see Dr. Shank on November 30, 2005. When Plaintiff went to talk to Al Gibson at work, Mr. Gibson informed him that there was no light duty work in a dust free environment for him to do at that point.
15. Plaintiff treated with Dr. Herbie Bryan of Albemarle Pulmonary Services on December 12, 2005, upon referral by Dr. Shank. On that date, Plaintiff complained of worsening shortness of breath and vague chest pain. Dr. Bryan noted that Plaintiff presented as a moderately obese man smelling strongly of cigarette smoke.
16. Plaintiff underwent a chest x-ray and CT scan, which revealed no evidence of any infiltrative process, no fibrosis or scarring, and marked emphysema through both lung fields with no evidence of pulmonary embolic disease. Pulmonary function tests showed moderate obstructive ventilator defect with a mild reduction in diffusion capacity, and an FEV1 of 62 percent of predicted.
17. Dr. Bryan diagnosed Plaintiff with dyspnea secondary to moderately advanced COPD, allergic rhinitis, and possible sleep apnea. Dr. Bryan found no evidence of an interstitial pneumonitis to suggest toxic inhalation from concrete dust. However, due to Plaintiff's *Page 7 
moderately advanced emphysema, he noted that any work-related air pollution might have aggravated Plaintiff's breathing difficulties. Dr. Bryan recommended immediate and complete smoking cessation, and treatment with antihistamines, aerosol steroids, and use of an inhaler for Plaintiff's condition.
18. Despite recommendations from Dr. Shank and Dr. Bryan, Plaintiff continued smoking subsequent to his dust exposure on October 21, 2005. Plaintiff testified that he continued smoking cigarettes through March of 2006.
19. Plaintiff underwent an independent medical examination (IME) by Dr. Selwyn Spangenthal of Charlotte Lung Health on November 2, 2006. Dr. Spangenthal noted Plaintiff's longstanding history of cigarette abuse, his history of chronic bronchitis and emphysema secondary to cigarette abuse, and acute exposure to a large amount of dust, sand, and concrete inhalation with subsequent worsening of shortness of breath and reactive airway disease.
20. Plaintiff underwent a CT scan of the chest on November 2, 2006, which revealed findings suspicious for basilar interstitial lung disease. As a result of the November 2, 2006 CT scan, Plaintiff underwent a high resolution CT scan of the chest on November 21, 2006, which revealed mild to moderate bilateral upper lobe parietal and centrilobular emphysema, hyperinflation with areas of linear pleural parenchymal scar at the lung bases, most likely due to prior inflammation, and mild right-sided pleural thickening with a small focus of calcification, also likely due to prior inflammation.
21. Plaintiff saw Dr. Spangenthal again on November 29, 2006. On that date, Dr. Spangenthal diagnosed Plaintiff with chronic bronchitis and emphysema secondary to longstanding cigarette abuse, along with reactive airway disease. Dr. Spangenthal recommended *Page 8 
that Plaintiff stay out of dusty environments. Dr. Spangenthal was of the opinion that Plaintiff's heavy exposure to the cinder block dust most likely resulted in acute exacerbation of his underlying COPD. Dr. Spangenthal based his opinion primarily on Plaintiff's work history of breathing in a large amount of material and cinder dust over a short period of time, as well as his development of acute symptoms. Dr. Spangenthal also had the benefit of prior medical records and his own examination.
22. Dr. Spangenthal reviewed Plaintiff's medical records that existed prior to the injury date, as well as the chest x-ray from April 21, 2005. Dr. Spangenthal testified that the April 2005 x-ray was normal, but the November 2006 x-ray was abnormal. Plaintiff's prior medical records revealed evidence of diffuse COPD consistent with cigarette smoking, with no active infiltrates, indicating that there was no evidence of any scarring or any shadows in the lung. The lung fields were clear, but hyper-inflated. Dr. Spangenthal testified, and the Full Commission finds as fact, that any COPD that Plaintiff had prior to October 21, 2005 involved no active scar tissue, and the COPD was not indicative of any condition that was disabling prior to his inhalation of cinder dust on October 21 through October 22, 2005.
23. Dr. Spangenthal recommended several treatments, which he felt would be advantageous to Plaintiff. Dr. Spangenthal was of the opinion that Plaintiff should be treated with bronchial dilators to open up the airway passages, and an inhaled steroid such as Advair, to help decrease any airway inflammation that might be present.
24. In lieu of pulmonary rehabilitation, Dr. Spangenthal initially recommended starting with medical treatment to see how Plaintiff responded. Dr. Spangenthal believed that it was possible that Plaintiff could have a very good response, and would not require pulmonary rehabilitation. *Page 9 
25. On May 4, 2007, Plaintiff underwent an evaluation with Dr. Jill A. Ohar, a Professor of Internal Medicine and Director of Clinical Operations at Wake Forest University. Dr. Ohar examined Plaintiff and reviewed his medical records. She opined, and the Full Commission finds as fact, that Plaintiff's COPD was most probably exacerbated by the cinder dust inhalation. In her report, she indicated that it is well known that exacerbations of COPD are associated with a six to eight week significant reductions in lung function that partially, but rarely, fully return to the level of pre-existing baseline. Dr. Ohar testified that COPD is characterized by a progressive loss of lung function and smoking is the primary risk factor, causing 85 to 90 percent of COPD. She recommended that Plaintiff stop smoking, as well as undergo treatment with Advair, Spiriva, and pulmonary rehabilitation.
26. Based on the history provided, Dr. Ohar ultimately opined, and the Full Commission finds as fact, that Plaintiff experienced an acute event, and that, as of Dr. Ohar's assessment, he was unable to return to work due to his resulting shortness of breath. Dr. Ohar opined that smoking cessation would be the first and foremost treatment recommendation for Plaintiff. This would improve his lung function temporarily, over the next two years. Next, per global obstructive lung disease guidelines, Plaintiff would need a long-acting bronchodilator and pulmonary rehabilitation. Finally, Dr. Ohar recommended prescription medications of Spiriva and Advair, concurrently, to decrease hyperinflation.
27. Dr. Ohar testified that current studies show that pulmonary rehabilitation in conjunction with other chemical therapies produce the best result. While Dr. Ohar could not predict whether Plaintiff would ever be able to return to work, she believed that there was a significant opportunity for improvement of the exacerbation with the proper treatment. The delay in treatment *Page 10 
would not necessarily interfere with later treatment, but lack of treatment would postpone any potential improvement. The Full Commission gives great weight to the opinions of Dr. Ohar.
28. Plaintiff was out of work from October 24, 2005 until the employer offered him a job at the same pay on or around January 10, 2006, wherein Plaintiff would answer a telephone in an office next to the canteen. Plaintiff never worked in an office before. It appeared that the phone he was to answer was not actually hooked up to an operational jack. Plaintiff reported to work; however, the dust from the outside driveway came in through open doors, and Plaintiff was exposed to this dust. At approximately 11:30 a.m., he went to Angie Pugh and told her he could no longer work because he could not breathe, and he went home.
29. The phone calls to the supervisors' area that Plaintiff was supposed to answer are dispatched from another location in the plant. The job offered to Plaintiff was a "make work" job, which gave him nothing to do but sit behind a desk to answer a telephone that would not ring because it was not connected. Also, Plaintiff was not offered work in a dust-free environment.
30. Based upon the greater weight of the evidence, the Full Commission finds that Plaintiff's job assignment on October 21 through October 22, 2005, which required him to saw and sledge hammer a cinder block wall, constituted an interruption of his normal work routine, and the introduction, thereby, of unusual conditions likely to result in unexpected consequences. Therefore, Plaintiff's heavy inhalation of cinder block dust while performing these activities on October 21 through October 22, 2005, which resulted in disabling shortness of breath, constituted an injury by accident. The medical evidence establishes that this heavy exposure to cinder dust aggravated Plaintiff's underlying COPD, and caused Plaintiff's shortness of breath and resulting disability. *Page 11 
31. Although the evidence of disability from a pulmonary standpoint indicates that Plaintiff is currently disabled from all work, except very sedentary work, with proper treatment he should be able to return to a higher level of pulmonary function and a higher work category. The evidence does not establish that he is totally and permanently disabled due to his pulmonary condition. Plaintiff established, by the greater weight of the evidence, however, that he is currently medically unable to work.
32. As of the close of the evidence, Defendant-Employer offered no suitable employment to Plaintiff within his restrictions that would not expose him to dust or fumes.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission enters the following:
 CONCLUSIONS OF LAW
1. Plaintiff suffered a compensable injury by accident arising out of and in the course and scope of his employment, causing injury to his lungs on or about October 21 through October 22, 2005, due to heavy inhalation of dust from cinder blocks. N.C. Gen. Stat. § 97-2(6).
2. As a result of this injury by accident, Plaintiff suffered an acute exacerbation of his underlying and preexisting COPD, causing severe shortness of breath and disability. Henry v. Lawrence LeatherCompany, 234 N.C. 126, 66 S.E.2d 693 (1951). As a consequence of his lung disease, at present, Plaintiff is and has been since the date of his exposure, unable to earn wages in the same or any other employment, and has been temporarily totally disabled from employment from October 24, 2005 and continuing. Plaintiff is entitled to temporary total disability compensation for his loss of wage earning capacity. Plaintiff is not permanently and *Page 12 
totally disabled, as the evidence establishes that his condition is likely to improve with proper treatment. N.C. Gen. Stat. § 97-29. 3. Plaintiff is entitled to medical treatment for the work-related injury to his lungs for so long as such treatment is reasonably required to effectuate a cure, provide relief, or lessen his period of disability. N.C. Gen. Stat. §§ 97-2(19), 97-25; Little v. Penn Ventilator Co. ¸317 N.C. 206, 209, 345 S.E.2d 204, 213 (1986). *Page 13 
4. Dr. Spangenthal should be authorized as Plaintiff's treating physician.
 * * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay all medical expenses for reasonably necessary treatment of Plaintiff's lung condition resulting from his injury by accident, including the treatment previously rendered by Dr. Shank, Dr. Spangenthal, Dr. Ohar, Stanly Memorial Hospital, and Dr. Bryan.
2. Plaintiff is entitled to receive, and Defendants shall pay, temporary total disability benefits in the amount of $258.04 per week for the period from October 24, 2005 and continuing until Plaintiff returns to work, or until further order of the Industrial Commission. All accrued benefits shall be paid in a lump sum.
3. A reasonable attorney fee of 25 percent of the benefits due Plaintiff shall be paid to his attorney as follows: 25 percent of the lump sum due Plaintiff shall be deducted and paid directly to his attorney, and thereafter, every fourth check due Plaintiff shall be paid to Plaintiff's attorney.
4. Dr. Spangenthal is hereby authorized as Plaintiff's treating physician.
5. Defendants shall pay the costs.
This the ___ day of July 2008.
S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/___________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/___________________ DIANNE C. SELLERS COMMISSIONER